UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF COLORADO

| | | |
|---|---|---|
| IN RE: | ) | |
| | ) | Case No. 22-10004-TBM |
| EL JEBOWL, LLC | ) | |
| EIN: 81-3166957 | ) | Chapter 11 |
| | ) | SubChapter V |
| Debtor. | ) | |

### THIRD AMENDED SUB-CHAPTER V PLAN OF REORGANIZATION
### DATED SEPTEMBER 26, 2022

El Jebowl, LLC (the "Debtor"), the Debtor and Debtor-in-Possession herein, by and through its undersigned counsel, hereby proposes, pursuant to Sub-Chapter V of Chapter 11, Title 11 of the United States Code, the following Plan of Reorganization (the "Plan").

### INTRODUCTION

This Plan and the disclosures contained herein are being provided to all creditors and Interest holders of the Debtor. This Plan is subject to confirmation pursuant to 11 U.S.C. § 1191 by the United States Bankruptcy Court for the District of Colorado Issues related to the merits of the Plan and its confirmation will be the subject of a confirmation hearing pursuant to Order of the Court that will be served upon you.

**The disclosures contained herein have not been approved by the Securities and Exchange Commission. The Securities and Exchange Commission has not reviewed the accuracy of adequacy of this document.**

The Plan is the governing document or contract with creditors once it is confirmed by the Court.

**WARNING: IF YOU ARE A CREDITOR YOUR RIGHTS MAY BE IMPAIRED BY THE PLAN.**

### CHAPTER 11 AND PLAN CONFIRMATION

Chapter 11 of the Code is designed to allow for the rehabilitation and reorganization of financially troubled entities or individuals. Chapter 11 allows the Debtor to retain its assets during administration of its Chapter 11 case as Debtor-in-Possession and following confirmation of a Plan as a reorganized Debtor or as provided in the Plan. Once the Plan is confirmed by the Court, the Plan is the permanent restructuring of the Debtor's financial obligations.

The Plan divides creditors into Classes of similarly situated creditors. All creditors of the same Class are treated in a similar fashion. All ownership Interests in the Debtor are also classified and treated alike. Each Class of creditors or Interest holders is either impaired or unimpaired under the Plan. A Class is unimpaired if the Plan leaves unaltered the legal, equitable and contractual rights to which each creditor in the Class is entitled. Alternatively, a claimant is unimpaired if the Plan provides for the cure of a default and reinstatement of the maturity date of the Claim as it existed prior to the default.

The Bankruptcy Court set a bar date establishing March 14, 2022 as the last date for filing Proofs of Claim. The Plan provides that Claims and Interests of all Classes shall be allowed only if evidenced by a timely filed Proof of Claim or Interest or which otherwise appear in the Schedules filed by the Debtor and are not scheduled as disputed, contingent or unliquidated unless subsequently allowed by the Court. Creditors may check as to whether or not their Claims have been scheduled as disputed, contingent or unliquidated by reviewing the Schedules filed by the Debtor with the Court. Alternatively, creditors may contact counsel for the Debtor directly in order to determine how they have been scheduled.

Code § 1191 provides that confirmation of the Plan shall occur if the Plan satisfies all provision of § 1129(a) except subparagraph 15 and § 1191(c).

## BACKGROUND AND EVENTS LEADING TO CHAPTER 11 FILING

The Debtor is a Texas-organized limited liability company that operates a bowling alley in El Jebel, Colorado. El Jebel is close to Glenwood Springs, Carbondale, Basalt, Snowmass, Willits, and Aspen. Open seven days a week, the premises has 16 bowling lanes, a full bar that serves beer and cocktails, and a kitchen for preparing and serving food. The location likewise has a patio overlooking Mount Sopris, video games, and pool tables. In addition to walk-in bowling, the Debtor generates money from various events and parties, and it has live music from time to time.

The Debtor's bankruptcy was prompted by a mix of issues. The COVID pandemic caused the shutdown of the business, followed by operational restrictions, that caused cash flow issues for the Debtor. The problem was compounded when the sprinkler system at the Debtor's leased premises failed causing the business to be shut down for a period of time. The second shut down further compounded the cash flow crisis. Moreover, the cash flow issues from the COVID restrictions left the Debtor with limited cash to handle the shut down caused by the issues with the

2

leased premise's sprinkler system.

## DESCRIPTION OF ASSETS

Unless otherwise indicated, as of the Petition Date, the values for the Debtor's primary assets are as follows:

| Asset | Market Value | Liquidation Value |
|---|---|---|
| Cash/Bank Accounts (9/1/22) | $8,508 | $0.00 |
| Inventory | $1,700.00 | $0.00 |
| Machinery and Equipment | $183,850.00 | $0.00 |
| Office Furniture/Equipment | $700.00 | $0.00 |
| Outstanding credit card receipts | $7,412.00 | $0.00 |
| TOTAL: | $202,170 | $0.00 |

The Debtor has listed its assets with the market values above. The Debtor's assets are subject to the liens of Veritex Community Bank ("Veritex"), the Small Business Administration ("SBA"), and the Colorado Department of Revenue. The Colorado Department of Revenue is owed approximately $27,922. Veritex is owed approximately $352,732. The SBA is owed approximately $158,183. The aggregate of these Secured Claims exceeds the value of the Debtor's collateral. Thus, there is no equity in the Debtor's assets if such assets were sold in a liquidation.

The Debtor is reserving the right to bring Avoidance Actions pursuant to 11 U.S.C. §§ 545 through 550 and state law based fraudulent conveyance actions. The applicable avoidance period for non-insiders is the 90 days prior to the Petition Date and insiders is one year prior to the Petition Date. The Debtor's Statement of Financial Affairs discloses that one non-insider, the Debtor's landlord received $37,600 during the Avoidance Action period for rent. If the lease with the landlord is assumed, this amount may be defensible since it would have to be paid back as a cure payment. With respect to insiders: (a) Craig Spivey received $41,683.68 in compensation, (b) Jenifer Spivey received loan repayment in the amount of $28,064.75, and (c) Craig and Jenifer Spivey received $3,000 in loan repayment. The Debtor is still evaluating whether these payments are subject to ordinary course or new value defenses.

## DESCRIPTION OF LIABILITIES

**A.    Priority Claims**

    **1.   Priority Claims**

Priority Claims are defined in the Plan as any pre-petition Claim entitled to a priority payment under § 507(a) of the Code, excluding any Administrative Claim or Tax Claims. Debtor is unaware of any Priority Claims at this time.

    **2.   Administrative Claims**

Administrative Claims are those Claims for payment of an administrative expense of a kind specified in §503(b) or §1114(e)(2) of the Code and entitled to priority pursuant to §507(a)(2) of the Code, including, but not limited to: (a) the actual, necessary costs and expenses, incurred after the Petition Date, of preserving the estates and operating the businesses of the Debtor, including wages, salaries, or commissions for services rendered after the commencement of the Chapter 11 Case; (b) Professional Fees; (c) any court approved fees and costs of the Sub-Chapter V Trustee; (d) all fees and charges assessed against the estates under 28 U.S.C. §1930; and (e) all Allowed Claims that are entitled to be treated as Administrative Claims pursuant to a Final Order of the Court under §503(b) of the Code, including any unpaid post-Petition Date tax obligations. The Administrative Claims, including the Professional Fees incurred during the case which remain unpaid, are as follows:

The Debtor retained Wadsworth Garber Warner Conrardy, P.C. ("WGWC") as its bankruptcy counsel. WGWC has not yet filed a fee application in this case. The Debtor provided WGWC with a retainer in the amount of $12,500.00 for post-petition services. After satisfaction of WGWC's Administrative the Debtor estimates that there will be an Administrative Claim for unpaid legal fees of WGWC of at least $25,000 on the Effective Date of the Plan. The legal fees could increase or decrease depending on the level of litigation over issues in the case including Plan confirmation and creditor claims.

The Debtor retained Law Offices of Kevin S. Neiman pc ("KSN") as its bankruptcy counsel. KSN has not yet filed a fee application in this case. The Debtor provided KSN with a retainer in the amount of $12,500.00 for post-petition services. After satisfaction of KSN's Administrative, he Debtor estimates that there will be an Administrative Claim for unpaid legal fees of KSN of at least $25,000 on the Effective Date of the Plan. The legal fees could increase

or decrease depending on the level of litigation in the case including Plan confirmation and creditor claims.

The Debtor retained Sumrall & Bondy ("Accountant") as its accountant. The Accountant has not yet filed a fee application in this case. The Debtor estimates that there will be an allowed Administrative claim for unpaid Accountant fees and costs of $10,000 as of the Effective Date of the Plan.

The fees of the Sub-Chapter V Trustee are estimated to not exceed $10,000. As with legal fees, the fees of the Sub-Chapter V Trustee could increase or decrease depending on the level of litigation over in the case including Plan confirmation. If Plan confirmation becomes contested, the Sub-Chapter V Trustee may play a role in trying to negotiate a resolution between the Debtor and objecting parties.

The Debtor has paid its other administrative expenses in the ordinary course of business during the course of the bankruptcy case, and, therefore, does not believe there will be any other material Administrative Claims asserted against the estate.

### 3. Tax Claims

Tax Claims are any Claim of a governmental unit for taxes entitled to priority pursuant to 11 U.S.C. §507(a)(8). The Debtor did not schedule any Tax Claims and none have been filed against the estate.

### B. Secured Claims

**Veritex Community Bank.** Veritex Community Bank is the holder of a Secured Claim pursuant to certain loan documents including promissory note, security agreement and UCC-1 financing statement. Veritex Community Bank asserts on lien on substantially all of the Debtor's assets. Vertiex Community Bank has filed a Proof of Claim asserting a secured Claim in the amount of $352,732.77. Payments have been made to Veritex Community Bank during the pendency of the bankruptcy case, which reduced the amount owed to the bank. As of June 30, 2022 the Veritex Community Bank is owed approximately $326,232.55.

**Small Business Administration.** The Small Business Administration is the holder of a Secured Claim pursuant to certain loan documents including promissory note, security agreement and UCC-1 financing statement. The SBA asserts on lien on substantially all of the Debtor's assets. The SBA has filed a Proof of Claim asserting a secured Claim in the amount of

$158,183.22.

**Colorado Department of Revenue.** The Colorado Department of Revenue is the holder of a secured Claim pursuant to a statutory lien for unpaid taxes. The Colorado Department of Revenue filed a Proof of Claim in the amount of $27,922.89, which amount is not disputed by the Debtor. Payments have been made to the Colorado Department of Revenue during the pendency of the bankruptcy case, which reduced the amount owed to the taxing authority. As of July 1, 2022 the Colorado Department of Revenue is owed approximately $23,083.96.

## C.    Non-Priority Unsecured Creditors

The Debtor scheduled a number of unsecured pre-petition debts. At least one of the unsecured creditors have filed Proofs of Claims. The bar date for filing Proofs of Claims against the Debtor was March 14, 2022. To the extent that a creditor files a Proof of Claim, the amount of the Claim as filed in the Proof of Claim will be used. The Claims list containing all known unsecured Claims against the Debtor, inclusive of any claims treated as unsecured under Code § 506, is attached hereto as Exhibit A. The Debtor scheduled non-priority unsecured Claims in the amount of $122,285.29. The total amount of non-priority unsecured Claims asserted against the estate is $435,934.29, including any deficiency claims.

## D.    Equity Holders

The owners of the Debtor are Craig Spivey who hold approximately an 81% interest in the Debtor and Thomas Weber hold approximately an 19% interest in the Debtor.

**THE PLAN**

**ARTICLE I**

**DEFINITIONS**

1.01 – <u>Administrative Claim</u> shall mean a Claim for payment of an administrative expense of a kind specified in §§ 503(b) or 1114(e)(2) of the Code and entitled to priority pursuant to § 507(a)(2) of the Code, including, but not limited to: (a) the actual, necessary costs and expenses, incurred after the Petition Date, of preserving the estate and operating the business of the Debtor, including wages, salaries, or commissions for services rendered after the commencement of the Chapter 11 Case; (b) Professional Fees; (c) all fees and charges assessed against the estate under 28 U.S.C. § 1930; (d) certain post-petition tax claims; and (e) all

Allowed Claims that are entitled to be treated as Administrative Claims pursuant to a Final Order of the Court under § 503(b) of the Code.

1.02 – <u>Allowed Claim</u> shall mean a Claim in respect of which a Proof of Claim has been filed with the Court within the applicable time period of limitation fixed by the Court in the case or scheduled in the list of creditors prepared and filed with the Court pursuant to Rule 1007(b) and not listed as disputed, contingent or unliquidated as to amount, and as to which no timely objection to the allowance thereof has been filed pursuant to Rules 3001 and 3007 or as to which any such objection has been determined by a Final Order.

1.03 – <u>Allowed Secured Claim</u> shall mean an Allowed Claim secured by a lien, security interest or other charge against or interest in property in which the Debtor has an interest, or which is subject to setoff under § 553 of the Code, to the extent of the value (determined in accordance with § 506(a) of the Code) of the interest of the holder of any such Allowed Claim and the Debtor's interest in such property or to the extent of the amount subject to such setoff as the case may be.

1.04 – <u>Avoidance Actions</u> shall mean the Debtor's estate's interest in any and all claims, rights and causes of action which have been or may be commenced by or on behalf of the Debtor to avoid and recover any transfers of property determined to be preferential, fraudulent or otherwise avoidable pursuant to §§ 544, 545, 547, 548, 549, 550 or 553 of the Code, or under any other applicable law, or otherwise subject to equitable subordination under § 510 of the Code, regardless of whether or not such actions have been commenced prior to the Effective Date of the Plan.

1.05 – <u>Claim</u> shall mean any right to payment, or right to any equitable remedy for breach of performance if such breach gives rise to the right to payment, against the Debtor in existence on or as of the Petition Date, whether or not such right to payment or right to an equitable remedy is reduced to judgment, liquidated, unliquidated, fixed, contingent, natured, unmatured, disputed, undisputed, legal, secured or unsecured.

1.06 – <u>Class</u> shall mean any Class into which Allowed Claims are classified pursuant to Article II of the Plan.

1.07 – <u>Class 1-6 Claims and Interests</u> shall mean the Allowed Claims and Interests so

classified in Article II of the Plan.

1.08 – <u>Code</u> shall mean the Bankruptcy Code, 11 U.S.C. §§ 101 et seq. and any amendments thereof.

1.09 – <u>Confirmation Date</u> shall mean the date upon which the Order of Confirmation is entered by the Court.

1.10 – <u>Court</u> shall mean the United States Bankruptcy Court for the District of Colorado in which the Debtor's Chapter 11 case is pending, pursuant to which this Plan is proposed, and any Court having competent jurisdiction to hear appeal or certiorari proceedings therefrom.

1.11 – <u>Debtor</u> shall mean the Debtor who is proposing this Chapter 11 Plan.

1.12 – <u>Disputed Claim</u> shall mean any Claim which is not an Allowed Claim, including, without limitation, any Claim designated as disputed, contingent or unliquidated in the Debtor's schedules filed in connection with the case, or any Claim against which an objection to the allowance thereof has been interposed, and as to which no Final Order has been entered.

1.13 – <u>Effective Date of the Plan</u> shall mean the Confirmation Date.

1.14 – <u>Final Order</u> shall mean an order or judgment of the Court which shall not have been reversed, stayed, modified or amended and as to which (a) the time to appeal from or to seek review, rehearing or certiorari shall have expired, and (b) no appeal or petition for review, rehearing or certiorari is pending, or if appealed shall have been affirmed or the appeal dismissed by the highest court to which such order was appealed, or if review, rehearing or certiorari was sought, such review, rehearing or certiorari has been denied and no further hearing, appeal or petition for review, rehearing or certiorari can be taken or granted or as to which any right to appeal or to seek a review, rehearing or certiorari has been waived.

1.15 – <u>Gross Revenue</u> shall mean gross monthly collections actually received by the Debtor during the Term of the Plan, derived from the operations of the Debtor, less all taxes collected over the same period.

1.16 – <u>Interest</u> shall mean any member or shareholder interest or any other instrument evidencing any ownership interest in the Debtor and any option, warrant or right of any nature, contractual or otherwise, to acquire a member or other ownership interest in the Debtor.

8

1.17 – <u>Order of Confirmation</u> shall mean the order entered by the Court confirming the Plan in accordance with the provisions of Chapter 11 of the Code.

1.18 – <u>Petition Date</u> shall mean January 2, 2022, the date on which the Debtor filed its Voluntary Petition.

1.19 – <u>Plan</u> shall mean this Plan of Reorganization, including all exhibits and schedules attached hereto or referenced herein or therein.

1.20 – <u>Priority Claim</u> shall mean any pre-petition Claim entitled to a priority in payment under § 507(a) of the Code, but shall not include any Administrative Claim or Tax Claim.

1.21 – <u>Pro Rata</u> shall mean the ratio of an Allowed Claim or Interest in a particular Class to the aggregate amount of all Allowed Claims or Interests in that Class.

1.22 – <u>Professional Fees</u> shall mean the Administrative Claims for compensation and reimbursement submitted pursuant to §§ 330, 331 and 503(b) of the Code by a professional.

1.23 – <u>Rules</u> shall mean the Federal Rules of Bankruptcy Procedure and Local Bankruptcy Rules for the District of Colorado as adopted by the Court.

1.24 – <u>Tax Claim</u> shall mean any unsecured Claim of a governmental unit for taxes entitled to priority pursuant to § 507(a)(8) of the Code.

1.25 – <u>Term of the Plan</u> shall mean the 5 year period after the Effective Date of the Plan.

1.26 – <u>Unclassified Priority Claims</u> shall mean Claims pursuant to § 507(a)(2) of the Code which are Administrative Claims allowed under § 503(b) of the Code and any fees and charges against the estate under Chapter 23 of Title 28 of the United States Code and shall further mean Allowed unsecured Claims of governmental units to the extent provided for in § 507(a)(8) of the Code.

1.27 – <u>Unsecured Creditor Account</u> shall mean that segregated account referenced and established pursuant to paragraphs 3.2 and 8.2 of this Plan, into which the Debtor will every month in accordance with the terms of this Plan deposit the Unsecured Creditor Payment during the term of the Plan.  At the end of each calendar quarter, the balance of the Unsecured Creditor Account will be distributed to the holders of Allowed Administrative Claims on a Pro Rata basis until such time as all holders of Allowed Administrative Claims have been paid in full, and then

will be distributed to Class 4 general unsecured creditors that hold Allowed Claims on a Pro Rata basis until the earlier of (a) five years or (b) Class 5 general unsecured creditors are paid in full. The account will be maintained at a federally insured banking institution and shall be maintained within the insurance limit of the institution.

1.28 – <u>Unsecured Creditor Payment</u> shall mean the percentage of Gross Revenue the Debtor shall deposit into the Unsecured Creditor Account during the term of the Plan. As set forth in the Projections attached hereto as Exhibit B, the Debtor shall deposit into the Unsecured Creditor Account during the term of the Plan: (a) 1.7% of Gross Revenue during the first year of the Term of the Plan; (b) 2.7% of Gross Revenue during the second year of the Term of the Plan; (c) 4.8% of Gross Revenue during the third year of the Term of the Plan; (d) 6.7% of Gross Revenue during the fourth year of the Term of the Plan; and (e) 9.5% of Gross Revenue during the fifth year of the Term of the Plan.

1.29- <u>Other Definitions</u>. Unless the context otherwise requires, any capitalized term used and not defined herein or elsewhere in the Plan but that is defined in the Code or Rules shall have the meaning set forth therein.

## ARTICLE II
## DESIGNATION OF CLAIMS AND INTERESTS

The following is a designation of all Classes of Claims and Interests other than those Claims of a kind specified in Sections 507(a)(2), 507(a)(3) or 507(a)(8) of the Code.

<u>Class 1</u> – All Allowed unsecured Claims specified in Section 507(a)(4) and 507(a)(5) of the Code as having priority.

<u>Class 2</u> – The Allowed Secured Claim of Veritex Community Bank.

<u>Class 3</u> – The Secured Claim of the Small Business Administration

<u>Class 4</u> – The Allowed Secured Claim of Colorado Department of Revenue

<u>Class 5</u> – The Allowed Claims held by unsecured creditors.

<u>Class 6</u> – The Interests in the Debtor.

## ARTICLE III
## SPECIFICATION AND TREATMENT OF UNCLASSIFIED PRIORITY CLAIMS

As provided in § 1123(a)(1) of the Code, the Claims against the Debtor covered in this

10

Article IV are not classified.  The holders of such Allowed Claims are not entitled to vote on the Plan.

3.1 – The holders of Allowed Claims of the type specified in § 507(a)(2) of the Code, Administrative Claims, shall receive cash equal to the amount of their Allowed Claim, or a lesser amount or different treatment as may be acceptable and agreed to by particular holders of such Claims.  Such Claims shall be paid in full on the Effective Date of the Plan or from the Unsecured Creditor Account established pursuant to paragraphs 3.2 and 8.2 of this Plan, or treated as otherwise agreed to by the particular holders of such Claims.  Section 507(a)(2) Administrative Claims that are allowed by the Court after the Effective Date of the Plan shall be paid upon allowance or treated as otherwise agreed to by the particular holders of such Claims.

3.2 – Upon the first full month after the Effective Date of the Plan and every month for the Term of the Plan, the Debtor shall deposit into the Unsecured Creditor Account the Unsecured Creditor Payment until the earlier of (a) five years or (b) Class 5 general unsecured creditors are paid in full.  At the end of each calendar quarter, the balance of the Unsecured Creditor Account will be distributed to the holders of Allowed Administrative Claims on a Pro Rata basis until such time as all holders of Allowed Administrative Claims have been paid in full, and then will be distributed to Class 5 general unsecured creditors that hold Allowed Claims on a Pro Rata basis.

3.3 – The Allowed Claims of a type specified in Section 507(a)(8) of the Code, Tax Claims of governmental taxing authorities, shall be paid in monthly installments on an amortized basis over a period that does not exceed five years from the Petition Date with interest at the appropriate rate set by applicable statute.

## ARTICLE IV

### SPECIFICATION AND TREATMENT OF CLASS 1 PRIORITY CLAIMS

4.1 - Allowed Class 1 Priority Claims shall be paid in full on the Effective Date.  The Class 1 Claims for certain pre-petition wages and employee Claims are more particularly described in Sections 507(a)(4) and 507(a)(5) of the Code.  Debtor is currently unaware of any Allowed Class 1 Priority Claims.

## ARTICLE V

## SPECIFICATION AND TREATMENT OF SECURED CLAIMS

5.1 – **Class 2, Veritex Community Bank**. The Class 2 secured Claim shall be treated as set forth herein.  The Class 2 secured Claim is impaired by this Plan.  The Class 2 secured Claim will be treated under this Plan as follows:

    a. The Class 2 secured Claim will be allowed in the full amount provided for under the governing loan documents and which allowed secured Claim totals $325,394.09 through September 23, 2022..

    b. The Class 2 Claim will bear interest at the rate of: (i) 5.5% per annum commencing on the Effective Date of the Plan.

    c. The Class 2 Claim shall be paid in equal monthly installments amortized over 9 years.

    d.  The Class 2 claimant will retain all liens that secure its Claim as of the Petition Date, subject to payment modification and principal amount of the loan as set forth herein.

    e. El Jebowl can pre-pay the balance of the Class 2 Claim in full at any time without any pre-payment penalty and fee.

    f.  All other provisions of the loan documents underlying the Class 2 Allowed Secured Claim are unmodified by the Plan.

    g. To the extent that the Class 2 claimant was unperfected in any of the Debtor's assets as of the Petition Date, upon entry of the Confirmation Order Class 2 claimant shall be deemed perfected in all of the Debtor's assets, and the Class 2 claimant may make such filings and recordings as necessary to effectuate the perfection.

    h. The Class 2 claimant has agreed that upon confirmation of the Plan the Class 2 claimant will be prohibited and enjoined from pursing any and all actions, claims, liens or other remedies against Craig Spivey arising under or related to the Unconditional Guarantee executed by Craig Spivey in favor of the Class 2 claimant unless and until there is a default by the Debtor under the Plan. In return, Craig Spivey hereby agrees that any state or federal statute of limitation which could be asserted to bar any action by Veritex Community Bank taken to enforce the Unconditional Guarantee, Note, or other Loan Documents shall be tolled for the period from the Effective Date of the Plan to the later of

(i) one year following the date of any default by the Debtor under the Plan; or (ii) one year following the expiration of the applicable limitations period.

5.2 – **Class 3, The Small Business Administration**. The Class 3 Claim is impaired by this Plan.  The Class 3 Claim shall be treated as a Class 5 unsecured claim pursuant to 11 U.S.C. § 506.  The Class 3 claimant shall file all appropriate documents to release its lien.  To the extent it fails to, the Debtor may file this Plan, the confirmation order with a release.

5.3 – **Class 4, The Colorado Department of Revenue.** The Class 4 secured Claim will be treated under this Plan as follows:

a.   The Class 4 Secured Claim shall be allowed in the amount owing to the Colorado Department of Revenue is unmodified by this Plan.

b. The Class 4 Claim shall accrue at the statutory interest rate.

c. The Class 4 Claim shall be paid in equal monthly installments over 5 years from the Petition Date.

d. The Class 4 claimant will retain all liens that secure its Claim as of the Petition Date, subject to payment modification set forth herein.

## ARTICLE VI
### SPECIFICATION AND TREATMENT OF UNSECURED CREDITOR CLAIMS

6.1 – Class 5 consists of the unsecured creditors of the Debtor who hold Allowed Claims.  Class 5 shall receive payment of their Allowed Claims as set forth below:

a.   Holders of Class 5 Allowed Claims shall share on a Pro Rata basis monies deposited into the Unsecured Creditor Account as set forth herein.  As set forth in Article IV, paragraph 3.2 of this Plan, upon the first fully month following the Effective Date of the Plan and every month until Administrative Claims are paid in full and then for the remainder of the Term of the Plan, the Debtor shall deposit into the Unsecured Creditor Account the Unsecured Creditor Payment.  At the end of each calendar quarter, the balance of the Unsecured Creditor Account will be distributed to the holders of Allowed Administrative Claims on a Pro Rata basis until such time as all holders of Allowed Administrative Claims have been paid in full, and then will be distributed to Class 5 general

unsecured creditors that hold Allowed Claims on a Pro Rata basis until the earlier of (a) five years or (b) Class 5 general unsecured creditors are paid in full.

    b.  To the extent that insider Craig Spivey and/or his spouse (together, the Spiveys) have made a loan to the Debtor or has any other obligation owed to them from the Debtor, the Claim of the Spiveys shall be subordinated to the Allowed Claims of Class 5 creditors other than the Spiveys.  The Debtor and the Spiveys can negotiate the treatment of the Spiveys' Claim after satisfaction of the obligations to Class 5 creditors holding allowed claims as set forth in this Plan.

## ARTICLE VII

## SPECIFICATION AND TREATMENT OF CLASS 6 INTERESTS

7.1 – Class 6 includes the Interests in the Debtor, which Interests are unimpaired by the Plan.  Upon confirmation of the Plan, all Class 6 Interest holders will retain their ownership Interests in the Debtor.

## ARTICLE VIII

## MEANS FOR THE PLAN'S EXECUTION

8.1 – Operation of Business.  The Debtor shall be empowered to take such action as may be necessary to perform its obligations under this Plan.

8.2 – Unsecured Creditor Account.  On the Effective Date of the Plan, the Debtor will open a separate interest-bearing deposit account at a federally insured commercial bank selected by the Debtor.  The bank account will be maintained by the Debtor as the Unsecured Creditor Account into which all payments made by the Debtor for the benefit of holders of Allowed Administrative Claims and Class 5 creditors will be made until the obligations under the Plan are completed.

8.3 – Effectuating the Plan.  On the Effective Date of the Plan, Craig Spivey shall be appointed as the agent of the Debtor pursuant to 11 U.S.C. §1142(b) for the purpose of carrying out the terms of the Plan, and taking all actions deemed necessary or convenient to consummating the terms of the Plans.

8.4 – Disputed Claim Procedure.  Distributions to any Class of creditors will only be made

on account of Allowed Claims.  In the event that distributions are made at a time that a Claim objection is pending before the Court or a judgment has entered to establish a Claim and the judgment is not subject to a Final Order, the portion of the distribution that would be paid to the disputed claimant will be held by the Debtor in an interest bearing bank account until the Claim is allowed or disallowed.  If allowed, the Claim will be paid its appropriate share of the withheld payment.  If disallowed, the withheld distribution will be paid on a Pro Rata basis to the remaining impaired claimants of the Debtor who hold Allowed Claims, or if all holders of Allowed Claims have been paid in full, paid to the Debtor.

8.5 – Claims and Litigation Bar Date and Standing.  All Claim objections and Avoidance Actions in the case must be filed by the later of (a) limitation period set forth in § 546(a) of the Code, or (b) sixty (60) days following the Effective Date of the Plan.  The Debtor shall have standing to commence, prosecute, and settle Claim objections and Avoidance Actions without need for Court approval. The Debtor has retained WGWC and KSN to litigate any Claim objections and Avoidance Actions on an hourly basis and/or a contingency fee basis, as it determines is reasonable and in the best interest of the estate.

8.6 – Administrative Expense Bar Date.  All applications for allowance and payment of Administrative Claims, including Professional Fees, must be filed within ninety (90) days following the Effective Date of the Plan.

8.7 – Monthly Installments.  Whenever the Plan provides for payment in monthly installments or a payment due in a certain month, the payment shall be due on the last day of the calendar month in which the payment is due, unless otherwise specified in the Plan.  The Debtor shall then have a five (5) day grace period within which the monthly payment must be received by the payee before the Debtor shall be in default, unless a longer period is specified elsewhere in the Plan.

8.8 – Final Decree.  The Debtor will request entry of a final decree closing the case on or before the later of the date all Claim objections and any pending litigation is concluded or one hundred eighty (180) days after the Effective Date of the Plan, or such other time as is appropriate under the proceedings of the case.

8.9 – Exemption from Transfer Taxes.  Pursuant to § 1146(c) of the Code, the issuance, transfer, or exchange of notes or equity securities under the Plan by the Debtor, the creation of

15

any mortgage, deed of trust, or other security interest, the making or assignment of any lease or the making or delivery of any deed or instrument of transfer under, in furtherance of, or in connection with the Plan or the Agreements shall not be subject to any stamp, real estate transfer, mortgage recording, or other similar tax.

8.10 – Contractual Relationship.  The Plan, upon confirmation, constitutes a new contractual relationship by and between the Debtor and its creditors.  A default shall occur under the Plan with respect to a particular class of creditor if the Debtor fails to comply with the terms of the Plan as it applies to such class of creditor.  In the event of a default by the Debtor under the Plan, a creditor or creditors in the class for which there is a default shall be entitled to enforce all rights and remedies against the Debtor for breach of contract, the Plan.  Any secured creditor claiming a breach of the Plan by the Debtor will be able to enforce all of its rights and remedies under its security documents, including foreclosure of its deed of trust, security agreement, lien, or mortgage pursuant to the terms of such document.  Any creditor claiming a breach by the Debtor must provide written notice to the Debtor of the claimed default, the notice must provide the Debtor a fourteen (14) day period within which to cure the claimed default, unless a longer period is specified elsewhere in the Plan.  Upon the Debtor's failure to cure the default within such fourteen (14) day period, the creditor may proceed to exercise its rights and remedies.

## ARTICLE IX
### EXECUTORY CONTRACTS AND UNEXPIRED LEASES

9.1 – On the Effective Date of the Plan, the Debtor does hereby assume those executory contracts and unexpired leases not expressly rejected or which have not been assumed by order of the Court prior to the Confirmation Date.  On the Confirmation Date, the Debtor shall be the holder of all right, title and interest to the assumed leases and contracts and such assumed leases and contracts shall be in full effect and binding upon the Debtor and the other parties thereto.  Confirmation of the Plan shall constitute a determination that the payments to be made to said creditors pursuant to the Plan satisfy all conditions precedent to assumption and assignment set forth in §§ 365(b) and (f) of the Code. The Debtor is assuming the following agreements unless rejected pursuant to paragraph 9.2 of this Plan.

a. The Debtor is a party to a commercial real property lease agreement with Crawford Properties ("Landlord") for is commercial real property space.  The Debtor and the Landlord

entered into a stipulation, approved by the Court, which resolves the majority of the ongoing relationship between the parties and is located at Docket No. 139 of the Case.

b. License agreement for Bowlski name with Bowlbrands, cure amount $0

c. Music and video service agreement with Bowling Music Service, cure amount $0.

d. Membership for non-alcoholic beverages and music licensing with The Bowling Proprietor's Association of America, cure amount $0.

9.2 – On the Effective Date of the Plan, the Debtor does hereby reject all executory contracts and unexpired leases to which it is a party for which a motion is pending or for which have been rejected by order of the Court prior to the Confirmation Date.  Executory contracts and unexpired leases will be rejected pursuant to the provisions of § 365 of the Code.  Any executory contract or unexpired lease not assumed in accordance with the Plan shall be rejected.

9.3 – Confirmation of the Plan constitutes approval by the Court of the rejection of the executory contracts and unexpired leases described herein in accordance with the provisions of § 365 of the Code and the Rules.

9.4 – Claims Arising from Rejection.  All Proofs of Claim with respect to Claims arising from the rejection of any executory contract or unexpired lease shall be filed with the Court within twenty (20) days after the earlier of: (i) the date of the Court's order approving the rejection of such executory contract or unexpired lease; (ii) rejection by operation of law under the Code; or (iii) the Confirmation Date.  Any Claims not filed within such time shall be forever barred against the Debtor, its estates and property, and any such Claims shall be disallowed in full.  Claims arising from such rejection, to the extent allowed, shall be treated as Class 4 unsecured Claims.

## ARTICLE X

## MISCELLANEOUS PROVISIONS

10.1 – Revestment.  On the Effective Date of the Plan, all property of the estate shall revest in the Debtor free and clear of all liens except those specifically set forth in the Plan or as otherwise provided in the Plan.

10.2 – Retention of Jurisdiction.  Notwithstanding confirmation of the Plan, the Court

shall retain jurisdiction for the following purposes:

(a)     Determination of the allowability of Claims upon objection to such Claims by the Debtor or by any other party in interest;

(b)     Determination of the request for payment of Claims entitled to priority under § 507(a)(2) of the Code, including compensation of the parties entitled thereto;

(c)     Resolution of any disputes regarding interpretation of the Plan;

(d)     Implementation of the provisions of the Plan and entry of orders in aid of consummation of the Plan, including without limitation, appropriate orders to protect the revested Debtor from action by creditors;

(e)     Modification of the Plan pursuant to § 1127 of the Code;

(f)     Adjudication of any causes of action, including Avoidance Actions, brought by the Debtor, by the representative of the estate or by a Trustee appointed pursuant to the Code;

(g)     Adjudication of any cause of action brought by the Debtor, by a representative of the estate, or by a Trustee appointed pursuant to the Code, or the revested Debtor exercising rights and powers as provided in §§ 542-549 of the Code.  This section shall not be construed to limit any other power or right which the Debtor may possess under any section of the Code; and

(h)     Entry of a final decree.

10.3 – Satisfaction of Claims.  The Debtor shall receive a discharge on the Effective Date of the Plan pursuant to § 1141(d) of the Code.  Confirmation of the Plan and the occurrence of the Effective Date of the Plan shall constitute a modification of any note or obligation for which specification and treatment is provided under the Plan as set forth in the Plan.  Any obligation or note, previously in default, so modified, shall be cured as modified as of the Effective Date of the Plan.  This provision shall be operable regardless of whether the Plan provides for any obligation to be evidenced by a rewritten loan or security document following confirmation of the Plan.

10.4 – Headings.  The headings used in the Plan are for convenience of reference only and shall not limit or in any manner affect the meaning or interpretation of the Plan.

10.5 – Notices.  All notices, requests, demands, or other communications required or permitted in this Plan must be given in writing to the party(ies) to be notified.  All

communications will be deemed delivered when received at the following addresses:

   a.  To the Debtor:
      El Jebowl
      c/o Craig Spivey
      280 Favre Lane
      El Jebel, CO 81623


      With a copy to:
      Aaron A. Garber
      Wadsworth Garber Warner Conrardy, P.C.
      2580 West Main Street, Suite 200
      Littleton, CO 80120
      Email: agarber@wgwc-law.com

      Kevin S. Neiman
      Law Office of Kevin S. Neiman, pc
      999 18th Street, Suite 1230 S
      Denver, CO  80202
      E-mail: kevin@ksnpc.com

   b.  To an allowed claimant, at the address set forth in the allowed Proof of Claim, if filed, or at the address set forth for the claimant in the Debtor's Schedules filed with the Court.

  10.5 – Successors and Assigns.  The Plan will be binding upon the Debtor, any creditor affected by the Plan and its heirs, successors, assigns and legal representatives.

  10.6 – Unclaimed Payments.  If a person or entity entitled to receive a payment or distribution pursuant to this Plan fails to negotiate a check, accept a distribution or leave a forwarding address in the event notice cannot be provided as set forth in paragraph 10.5 of the Plan, within six months of the Effective Date of the Plan, the person or entity is deemed to have released and abandoned any right to payment or distribution under the Plan.

## ARTICLE XI

## CONFIRMATION REQUEST

  11.1 – The Debtor, as the proponent of the Plan, requests confirmation of the Plan pursuant to § 1191 of the Code.  If the Plan is confirmed on an uncontested basis the Debtor will receive a discharge upon confirmation, otherwise the Debtor will receive a discharge upon

19

meeting its Plan obligations to Class 5.

## PLAN FEASIBILITY

The Debtor believes that the Plan, as proposed, is feasible.  The funding for the Plan will come from the Debtor's continued operations.  Attached hereto as Exhibit B is the Debtor's five year projections for its financial performance for the Term of the Plan along with a cash balance statement.  Exhibit B is referred to herein as the "Projections."  The revenue section of the Projections includes both Gross Revenue and any owner investment, but excludes any collections by the Debtor for taxes.  As detailed in the Projections, the Debtor will have sufficient cash on hand and profits during the Term of the Plan to satisfy its Plan obligations.

The Debtor's Projections show the Debtor's annual projected Gross Revenue for year one of the Plan is $724,400. Based on the projected Gross Revenue of $724,400, the estimated payment into the Unsecured Credit Account for year one is $12,314.80 ($724,400 x 1.7%).  The projected expenses for year one of the Plan is $712,026.32 (not including the payment to unsecured creditors or the $125,000 in back rent payments to the landlord).  The Projections show projected disposable income of $12,373.68 and that the Debtor will have sufficient income in year one to satisfy the estimated payments into the Unsecured Creditors Account after meeting its other expenses.

The Debtor's Projections show the Debtor's annual projected Gross Revenue for year two of the Plan is $757,946.83.  Based on the projected Gross Revenue of $757,946.83, the estimated payment into the Unsecured Credit Account for year two is $20,464.56 ($757,946.83 x 2.7%).  The projected expenses for year two of the Plan is $737,136.10, not including the payment to unsecured creditors.  The Projections show projected disposable income of $20,810.73 and that the Debtor will have sufficient income in year two to satisfy the payments into the Unsecured Creditor Account after meeting its other expenses.

The Debtor's Projections show the Debtor's annual projected Gross Revenue for year three of the Plan is $793,117.64.  Based on the projected Gross Revenue of $793,117.64, the estimated payment into the Unsecured Credit Account for year three is $38,069.64 ($793,117.64 x 4.8%).  The projected expenses for year three of the Plan is $754,912.16, not including the payment to unsecured creditors.  The Projections show projected disposable income of $38,205.48 and that the Debtor will have sufficient income in year three to satisfy the payments into the Unsecured Creditor Account after meeting its other expenses.

The Debtor's Projections show the Debtor's annual projected Gross Revenue for year four of the Plan is $829,993.54. Based on the projected Gross Revenue of $829,993.54, the estimated payment into the Unsecured Credit Account for year four is $55,609.56 ($829,993.54 x 6.7%). The projected expenses for year four of the Plan is $774,472.34, not including the payment to unsecured creditors. The Projections show projected disposable income of $55,521.19 and that the Debtor will have sufficient income in year four to satisfy the payments to the Unsecured Creditor Account after meeting its other expenses.

The Debtor's Projections show the Debtor's annual projected Gross Revenue for year five of the Plan is $868,659.74. Based on the projected Gross Revenue of $793,117.64, the estimated payment into the Unsecured Credit Account for year five is $82,522.67 ($868,659.74 x 9.5%). The projected expenses for year five of the Plan is $786,648.63, not including the payment to unsecured creditors. The Projections show projected disposable income of $82,011.11 and that the Debtor will have sufficient income in year five to satisfy the payments to the Unsecured Creditor Account after meeting its other expenses.

The payments to be made into the Unsecured Credit Account is based on actual Gross Revenue received by the Debtor during the Plan term and may vary from the projected payments set forth above..

## TAX CONSEQUENCES

The Debtor is not providing tax advice to creditors or Interest holders. Each party affected by the Plan should consult its own tax advisor for information as to the tax consequences of Plan confirmation. Generally, unsecured creditors should have no tax impact as a result of Plan confirmation. The recovery of each creditor is payment on account of a debt and generally not taxable, unless the creditor wrote off the debt against income in a prior year, in which case income may have to be recognized. Interest holders may have very complicated tax effects as a result of Plan confirmation.

## LIQUIDATION ANALYSIS UNDER CHAPTER 7

The principal alternative to the Debtor's reorganization under Chapter 11 is a conversion of the case to Chapter 7 of the Code. Chapter 7 requires the liquidation of the Debtor's assets by

a Trustee who is appointed by the United States Trustee's office. In a Chapter 7 case, the Chapter 7 Trustee would take over control of the assets. The assets would be liquidated and the proceeds distributed to creditors in the order of their priorities. Under a Chapter 7 liquidation, secured creditors would likely seek to obtain relief from the automatic stay and foreclose their security interests in Debtor's property.

As described in the asset section of this Plan, the Debtor has assets with a total liquidation value of $0. The Debtor's total asset value is approximately $202,170. The Debtor's assets are subject to the liens of Veritex, the SBA, and the Colorado Department of Revenue. The Colorado Department of Revenue is owed approximately $23,083.96. Veritex is owed approximately $326,232.55. The SBA is owed approximately $158,183. The aggregate of these Secured Claims exceeds the value of the Debtor's collateral. Thus, there is no equity in the Debtor's assets if such assets were sold in a liquidation, and unsecured creditors would not receive a distribution in a Chapter 7.

Under the Plan it is projected that Class 5 Allowed Claims will total $435,934.29. Pursuant to the Projections, it is projected that the Debtor will be paying Administrative Claim and to Class 5 unsecured creditors $208,981.23. After projected payments to Administrative Claims in the amount $70,000, it is projected that $143,011.11 will be available for distribution to unsecured creditors. Based upon projected Class 5 Allowed Claims of $435,934.29, and assuming there is $143,011.11 to distribute to Class 5 claimants, the Plan contemplates all creditors holding Allowed Unsecured Claims will receive a pro rata distribution of approximately 33%. This amount could increase or decrease depending upon the amount of allowed Administrative Claims and the amount of Gros Revenue after the Plan is confirmed.

DATED: September 26, 2022

EL JEBOWL, LLC


By: */s/ Craig Spivey*
Craig Spivey

22

WADSWORTH GARBER WARNER CONRARDY, PC


By: *Aaron A. Garber*
  Aaron A. Garber #36099
  Wadsworth Garber Warner Conrardy, P.C.
  2580 West Main Street, Suite 200
  Littleton, CO 80120
  Telephone: (303) 296-1999
  Telecopy: (303) 296-7600
  Email: agarber@wgwc-law.com


And


LAW OFFICES OF KEVIN S. NEIMAN, PC

*/s/ Kevin S. Neiman*
Kevin S. Neiman, # 36560
999 18th Street, Suite 1230 S
Denver, CO  80202
Telephone: (303) 996-8637
Fax: (877) 611-6839
E-mail: kevin@ksnpc.com

ATTORNEYS FOR DEBTOR AND DEBTOR-IN-POSSESSION

**EXHIBIT A**

**EXHIBIT A**

**Case No. 22-10004 – El Jebowl, LLC**

| CLAIMANT | SCHEDULED AMOUNT | PROOF OF CLAIM |
|---|---|---|
| 6ticketbeer, LLC | $65,170.79 | $0.00 |
| Bank of Colorado | $0.00 | $34,517.01 |
| Beverage Distributors Company, LLC | $0.00 | $400.89 |
| Black Hills Energy | $950.00 | $0.00 |
| BowlBrands | $44,039.07 | $0.00 |
| Century Link | $164.84 | $0.00 |
| Chris Kurzner | $3,000.00 | $0.00 |
| Direct TV | $264.99 | $0.00 |
| Holy Cross Energy | $841.91 | $0.00 |
| Internal Revenue Service | $0.00 | $4,527.29 |
| Jayhawk Bowling Supply | $10.72 | $0.00 |
| Jennifer Spivey | $6,171.00 | $0.00 |
| Marble Distilling Company, Inc. | $485.82 | $0.00 |
| Mid Valle Metropolitian | $159.39 | $0.00 |
| Mountain Bev | $559.80 | $0.00 |
| Mountain Waste and Recycling | $255.00 | $0.00 |
| SBA | $158,183 | $0.00 |
| Veritex deficiency claim | $116,233 | $0.00 |
| **TOTAL** | **$396,489.10** | **$39,445.19** |
| **TOTAL CLAIMS ASSERTED** | | **$435,934.29** |

Total claims asserted is comprised of the "scheduled amount"
except if a proof of claim is filed, in which case the proof of claim
is considered in determing the total claims asserts

**EXHIBIT B**

El Jebowl – 5 YR Financial Projection

Annual Detail

### YEAR 1

| Revenues | % of sales | $ |
|---|---|---|
| Sales – Food | 29.13 | $211,000.00 |
| Sales – Beer | 7.73 | $56,000.00 |
| Sales – Wine | 1.30 | $9,400.00 |
| Sales – Liquor | 15.05 | $109,000.00 |
| Sales – Events | 3.59 | $26,000.00 |
| Sales – Bowling | 39.90 | $289,000.00 |
| Sales – Gaming | 3.31 | $24,000.00 |
| Total Food / Events | 32.72 | $237,000.00 |
| Total Liquor, Beer, and Wine | 24.08 | $174,400.00 |
| Total Game Sales | 43.21 | $313,000.00 |
| Gross Revenue | | $724,400.00 |
| Other Income (Owner Investment) | | $125,000.00 |
| Total Income | | $849,400.00 |

| Cost of Goods | % of sales | $ |
|---|---|---|
| Total Food Purchase | 22.00% | $52,140.00 |
| Liquor, Beer, Wine | 18.00% | $31,392.00 |
| Non-Alcohol (% of food sales) | 1.50 | $3,555.00 |
| Total COGS % of Total Sales | 12.02 | $87,087.00 |
| | | |
| Labor Cost | | |
| Hourly Kitchen | 7.50% | $54,330.00 |
| Hourly Bussers | 0.00% | $0.00 |
| Hourly Host | 2.00% | $14,488.00 |
| Hourly Bar | 1.70% | $12,314.80 |
| Hour Wait Staff | 0.00% | $0.00 |
| Key Employee | 2.33% | $16,878.52 |
| Salary Management | 5.00% | $36,220.00 |
| Mechanic | | $22,000.00 |
| Total Labor | | $156,231.32 |
| Payroll Taxes | | |
| Employer Payroll Taxes | | $76,900.00 |
| Total Labor Cost | 32.18 | $233,131.32 |

### YEAR 2

| Revenues | % of sales | $ |
|---|---|---|
| Sales – Food | 28.70 | $217,525.77 |
| Sales – Beer | 7.78 | $58,947.37 |
| Sales – Wine | 1.31 | $9,894.74 |
| Sales – Liquor | 15.14 | $114,736.84 |
| Sales – Event Food | 3.61 | $27,368.42 |
| Sales – Bowling | 40.14 | $304,210.53 |
| Sales – Gaming | 3.33 | $25,263.16 |
| Total Food | 32.31 | $244,894.19 |
| Total Liquor, Beer, and Wine | 24.22 | $183,578.95 |
| Total Game Sales | 43.47 | $329,473.68 |
| Gross Revenue | | $757,946.83 |
| Other Income | | $0.00 |
| Total Income | | $757,946.83 |

| Cost of Goods | % of sales | $ |
|---|---|---|
| Total Food Purchase | 22.00% | $53,876.72 |
| Liquor, Beer, Wine | 18.00% | $33,044.21 |
| Non-Alcohol (% of food sales) | 1.50 | $3,673.41 |
| Total COGS % of Total Sales | 11.95 | $90,594.35 |
| | | |
| Labor Cost | | |
| Hourly Kitchen | 7.50% | $56,846.01 |
| Hourly Bussers | 0.00% | $0.00 |
| Hourly Host | 2.00% | $15,158.94 |
| Hourly Bar | 1.70% | $12,885.10 |
| Hour Wait Staff | 0.00% | $0.00 |
| Key Employee | 2.33% | $17,660.16 |
| Salary Management | 5.00% | $37,897.34 |
| Mechanic | | $22,000.00 |
| Total Labor | | $162,447.55 |
| Payroll Taxes | | |
| Employer Payroll Taxes | | $88,000.00 |
| Total Labor Cost | 33.04 | $250,447.55 |

Annual Detail

| Total Cost of Sales | 44.20 | $320,218.32 |
|---|---|---|

| Expenses | % of sales | $ |
|---|---|---|
| **Controllable Expenses** | | |
| Supplies | | $14,000.00 |
| Restaurant/Bar Supplies | | $8,000.00 |
| Linen Expenses | | $12,000.00 |
| Paper Inventory Products | | $11,000.00 |
| Uniform Expenses | | $1,500.00 |
| **Total Supplies** | 6.42 | $46,500.00 |
| | | |
| **Services** | | |
| Equipment Purchase | | $2,200.00 |
| Repair and Maintenance | | $21,000.00 |
| Janitorial | | $16,000.00 |
| Equipment Rental | | $3,600.00 |
| Telephone | | $1,200.00 |
| Entertainment | | $8,100.00 |
| Utilities Water & Electric | | $52,000.00 |
| Utilities Gas | | $9,000.00 |
| **Total Services** | 15.61 | $113,100.00 |
| | | |
| **Total Controllable Expenses** | 22.03 | $159,600.00 |

| Operating Income | | $244,582 |
|---|---|---|

| General and Admin. Expenses | % of sales | $ |
|---|---|---|
| Credit Card Fee | 2.5 | $18,110.00 |
| Insurance | | $7,244.00 |
| Rent | | $153,600.00 |
| Liquor Tax | 6 | $10,464.00 |
| Exterminators | | $800.00 |
| Cable & Internet | | $1,100.00 |
| Security | | $500.00 |
| Printing | | $0.00 |
| **Total General & Admin Expenses** | 22.98 | $166,464.00 |

| Total Cost of Sales | 45.00 | $341,041.89 |
|---|---|---|

| Expenses | % of sales | $ |
|---|---|---|
| **Controllable Expenses** | | |
| Supplies | | $14,000.00 |
| Restaurant/Bar Supplies | | $8,000.00 |
| Linen Expenses | | $12,000.00 |
| Paper Inventory Products | | $12,000.00 |
| Uniform Expenses | | $1,500.00 |
| **Total Supplies** | 6.27 | $47,500.00 |
| | | |
| **Services** | | |
| Equipment Purchase | | $2,000.00 |
| Repair and Maintenance | | $18,000.00 |
| Janitorial | | $16,000.00 |
| Equipment Rental | | $3,600.00 |
| Telephone | | $1,200.00 |
| Entertainment | | $9,200.00 |
| Utilities Water & Electric | | $52,000.00 |
| Utilities Gas | | $9,000.00 |
| **Total Services** | 14.64 | $111,000.00 |
| | | |
| **Total Controllable Expenses** | 20.91 | $158,500.00 |

| Operating Income | | $258,405 |
|---|---|---|

| General and Admin. Expenses | % of sales | $ |
|---|---|---|
| Credit Card Fee | 2.5 | $18,948.67 |
| Insurance | | $7,579.47 |
| Rent | | $153,600.00 |
| Liquor Tax | 6 | $11,014.74 |
| Exterminators | | $800.00 |
| Cable & Internet | | $3,500.00 |
| Security | | $1,500.00 |
| Printing | | $1,000.00 |
| **Total General & Admin Expenses** | 22.62 | $171,414.74 |

Annual Detail

| Corporate Expenses | % of sales | $ |
|---|---|---|
| Back Rent Payment | | $125,000.00 |
| Accounting & bookkeeping | | $3,400.00 |
| Marketing | | $2,000.00 |
| Legal | | $3,000.00 |
| Brand License (BowlBrands) | 1 | $7,244.00 |
| **Total Corporate Expense** | **19.42** | **$140,644.00** |

| Corporate Expenses | % of sales | $ |
|---|---|---|
| Management Fees | 0 | $0.00 |
| Accounting & bookkeeping | | $3,500.00 |
| Marketing | | $2,000.00 |
| Legal | | $3,000.00 |
| Brand License (BowlBrands) | 1 | $7,579.47 |
| **Total Corporate Expense** | **2.12** | **$16,079.47** |

| Secured Ceditor Payments | | |
|---|---|---|
| **Colorad Dept. Revenue** | | $5,100.00 |
| **Veritex** | | $45,000.00 |
| **TOTAL** | | **$50,100.00** |

| Secured Ceditor Payments | | |
|---|---|---|
| **Colorad Dept. Revenue** | | $5,100.00 |
| **Veritex** | | $45,000.00 |
| **TOTAL** | | **$50,100.00** |

**Total Expenses**      $837,026.32

     $737,136.10

| Net Operating Income | 1.71 | $12,373.68 |
|---|---|---|

| Net Operating Income | 2.75 | $20,810.73 |
|---|---|---|

Page 3

Annual Detail

## YEAR 3

| Revenues | % of sales | $ |
|---|---|---|
| Sales – Food | 28.27 | $224,253.37 |
| Sales – Beer | 7.82 | $62,049.86 |
| Sales – Wine | 1.31 | $10,415.51 |
| Sales – Liquor | 15.23 | $120,775.62 |
| Sales – Event Food | 3.63 | $28,808.86 |
| Sales – Bowling | 40.38 | $320,221.61 |
| Sales – Gaming | 3.35 | $26,592.80 |
| Total Food | 31.91 | $253,062.24 |
| Total Liquor, Beer, and Wine | 24.36 | $193,241.00 |
| Total Game Sales | 43.73 | $346,814.40 |
| Gross Revenue | | $793,117.64 |
| Other Income (Owner Investment) | | $75,000.00 |
| Total Income | | $868,117.64 |

| Cost of Goods | % of sales | $ |
|---|---|---|
| Total Food Purchase | 22.00% | $55,673.69 |
| Liquor, Beer, Wine | 18.00% | $34,783.38 |
| Non-Alcohol (% of food sales) | 1.50 | $3,795.93 |
| Total COGS % of Total Sales | 11.88 | $94,253.01 |

| Labor Cost | | |
|---|---|---|
| Hourly Kitchen | 7.50% | $59,483.82 |
| Hourly Bussers | 0.00% | $7,931.18 |
| Hourly Host | 2.00% | $0.00 |
| Hourly Bar | 1.70% | $13,483.00 |
| Hour Wait Staff | 0.00% | $0.00 |
| Key Employee | 2.33% | $18,479.64 |
| Salary Management | 5.00% | $39,655.88 |
| Mechanic | | $26,000.00 |
| Total Labor | | $165,033.52 |
| Payroll Taxes | | |
| Employer Payroll Taxes | | $91,000.00 |
| Total Labor Cost | 32.28 | $256,033.52 |

## YEAR 4

| Revenues | % of sales | $ |
|---|---|---|
| Sales – Food | 27.85 | $231,189.05 |
| Sales – Beer | 7.87 | $65,315.64 |
| Sales – Wine | 1.32 | $10,963.70 |
| Sales – Liquor | 15.32 | $127,132.24 |
| Sales – Event Food | 3.65 | $30,325.12 |
| Sales – Bowling | 40.61 | $337,075.38 |
| Sales – Gaming | 3.37 | $27,992.42 |
| Total Food | 31.51 | $261,514.17 |
| Total Liquor, Beer, and Wine | 24.51 | $203,411.58 |
| Total Game Sales | 43.98 | $365,067.79 |
| Gross Revenue | | $829,993.54 |
| Other Income | | $0.00 |
| Total Income | | $829,993.54 |

| Cost of Goods | % of sales | $ |
|---|---|---|
| Total Food Purchase | 22.00% | $57,533.12 |
| Liquor, Beer, Wine | 18.00% | $36,614.08 |
| Non-Alcohol (% of food sales) | 1.50 | $3,922.71 |
| Total COGS % of Total Sales | 11.82 | $98,069.91 |

| Labor Cost | | |
|---|---|---|
| Hourly Kitchen | 7.50% | $62,249.52 |
| Hourly Bussers | 0.00% | $0.00 |
| Hourly Host | 2.00% | $16,599.87 |
| Hourly Bar | 1.70% | $14,109.89 |
| Hour Wait Staff | 0.00% | $0.00 |
| Key Employee | 2.33% | $19,338.85 |
| Salary Management | 5.00% | $41,499.68 |
| Mechanic | | $26,000.00 |
| Total Labor | | $179,797.80 |
| Payroll Taxes | | |
| Employer Payroll Taxes | | $91,000.00 |
| Total Labor Cost | 32.63 | $270,797.80 |

| Total Cost of Sales | 44.17 | $350,286.53 |
|---|---|---|

| Expenses | % of sales | $ |
|---|---|---|
| **Controllable Expenses** | | |
| Supplies | | $14,000.00 |
| Restaurant/Bar Supplies | | $8,000.00 |
| Linen Expenses | | $12,000.00 |
| Paper Inventory Products | | $14,000.00 |
| Uniform Expenses | | $1,500.00 |
| **Total Supplies** | 6.24 | $49,500.00 |
| | | |
| **Services** | | |
| Equipment Purchase | | $5,000.00 |
| Repair and Maintenance | | $19,000.00 |
| Janitorial | | $16,000.00 |
| Equipment Rental | | $3,600.00 |
| Telephone | | $1,200.00 |
| Entertainment | | $10,000.00 |
| Utilities Water & Electric | | $52,000.00 |
| Utilities Gas | | $9,000.00 |
| **Total Services** | 14.60 | $115,800.00 |
| | | |
| **Total Controllable Expenses** | 20.84 | $165,300.00 |

| Operating Income | | $277,531 |
|---|---|---|

| General and Admin. Expenses | % of sales | $ |
|---|---|---|
| Credit Card Fee | 2.5 | $19,827.94 |
| Insurance | | $7,931.18 |
| Rent | | $153,600.00 |
| Liquor Tax | 6 | $11,594.46 |
| Exterminators | | $800.00 |
| Cable & Internet | | $3,500.00 |
| Security | | $1,500.00 |
| Printing | | $1,800.00 |
| **Total General & Admin Expenses** | 21.79 | $172,794.46 |

Annual Detail

| Total Cost of Sales | 44.44 | $368,867.71 |
|---|---|---|

| Expenses | % of sales | $ |
|---|---|---|
| **Controllable Expenses** | | |
| Supplies | | $14,000.00 |
| Restaurant/Bar Supplies | | $8,000.00 |
| Linen Expenses | | $12,000.00 |
| Paper Inventory Products | | $14,000.00 |
| Uniform Expenses | | $1,500.00 |
| **Total Supplies** | 5.96 | $49,500.00 |
| | | |
| **Services** | | |
| Equipment Purchase | | $5,000.00 |
| Repair and Maintenance | | $19,000.00 |
| Janitorial | | $16,000.00 |
| Equipment Rental | | $3,600.00 |
| Telephone | | $1,200.00 |
| Entertainment | | $10,000.00 |
| Utilities Water & Electric | | $52,000.00 |
| Utilities Gas | | $9,000.00 |
| **Total Services** | 13.95 | $115,800.00 |
| | | |
| **Total Controllable Expenses** | 19.92 | $165,300.00 |

| Operating Income | | $295,826 |
|---|---|---|

| General and Admin. Expenses | % of sales | $ |
|---|---|---|
| Credit Card Fee | 2.5 | $20,749.84 |
| Insurance | | $8,299.94 |
| Rent | | $153,600.00 |
| Liquor Tax | 6 | $12,204.69 |
| Exterminators | | $800.00 |
| Cable & Internet | | $3,500.00 |
| Security | | $1,500.00 |
| Printing | | $1,800.00 |
| **Total General & Admin Expenses** | 20.89 | $173,404.69 |

| Corporate Expenses | % of sales | $ |
|---|---|---|
| Management Fees | 0 | $0.00 |
| Accounting & bookkeeping | | $3,500.00 |
| Marketing | | $2,000.00 |
| Legal | | $3,000.00 |
| Brand License (BowlBrands) | 1 | $7,931.18 |
| Total Corporate Expense | 2.07 | $16,431.18 |

| Secured Ceditor Payments | |
|---|---|
| Colorad Dept. Revenue | $5,100.00 |
| Veritex | $45,000.00 |
| TOTAL | $50,100.00 |

$754,912.16

| Net Operating Income | 4.82 | $38,205.48 |
|---|---|---|

**Annual Detail**

| Corporate Expenses | % of sales | $ |
|---|---|---|
| Management Fees | 0 | $0.00 |
| Accounting & bookkeeping | | $3,500.00 |
| Marketing | | $2,000.00 |
| Legal | | $3,000.00 |
| Brand License (BowlBrands) | 1 | $8,299.94 |
| Total Corporate Expense | 2.02 | $16,799.94 |

| Secured Ceditor Payments | |
|---|---|
| Colorad Dept. Revenue | $5,100.00 |
| Veritex | $45,000.00 |
| TOTAL | $50,100.00 |

$774,472.34

| Net Operating Income | 6.69 | $55,521.19 |
|---|---|---|

Annual Detail

YEAR 5

| Revenues | % of sales | $ |
|---|---|---|
| Sales – Food | 27.44 | $238,339.22 |
| Sales – Beer | 7.91 | $68,753.31 |
| Sales – Wine | 1.33 | $11,540.73 |
| Sales – Liquor | 15.41 | $133,823.41 |
| Sales – Event Food | 3.67 | $31,921.18 |
| Sales – Bowling | 40.85 | $354,816.18 |
| Sales – Gaming | 3.39 | $29,465.70 |
| Total Food | 31.11 | $270,260.40 |
| Total Liquor, Beer, and Wine | 24.65 | $214,117.45 |
| Total Game Sales | 44.24 | $384,281.89 |
| Gross Revenue | | $868,659.74 |
| Other Income | | $0.00 |
| Total Income | | $868,659.74 |

| Cost of Goods | % of sales | $ |
|---|---|---|
| Total Food Purchase | 22.00% | $59,457.29 |
| Liquor, Beer, Wine | 18.00% | $38,541.14 |
| Non-Alcohol (% of food sales) | 1.50 | $4,053.91 |
| Total COGS % of Total Sales | 11.75 | $102,052.34 |
| | | |
| Labor Cost | | |
| Hourly Kitchen | 7.50% | $65,149.48 |
| Hourly Bussers | 0.00% | $0.00 |
| Hourly Host | 2.00% | $17,373.19 |
| Hourly Bar | 1.70% | $14,767.22 |
| Hour Wait Staff | 0.00% | $0.00 |
| Key Employee | 2.33% | $20,239.77 |
| Salary Management | 5.00% | $43,432.99 |
| Mechanic | | $26,000.00 |
| Total Labor | | $186,962.65 |
| Payroll Taxes | | |
| Employer Payroll Taxes | | $91,000.00 |
| Total Labor Cost | 32.00 | $277,962.65 |

Page 7

Annual Detail

| Total Cost of Sales | 43.75 | $380,014.98 |
|---|---|---|

| Expenses | % of sales | S |
|---|---|---|
| **Controllable Expenses** | | |
| Supplies | | $14,000.00 |
| Restaurant/Bar Supplies | | $8,000.00 |
| Linen Expenses | | $12,000.00 |
| Paper Inventory Products | | $14,000.00 |
| Uniform Expenses | | $1,500.00 |
| **Total Supplies** | **5.70** | **$49,500.00** |
| | | |
| **Services** | | |
| Equipment Purchase | | $5,000.00 |
| Repair and Maintenance | | $19,000.00 |
| Janitorial | | $16,000.00 |
| Equipment Rental | | $3,600.00 |
| Telephone | | $1,200.00 |
| Entertainment | | $10,000.00 |
| Utilities Water & Electric | | $52,000.00 |
| Utilities Gas | | $9,000.00 |
| **Total Services** | **13.33** | **$115,800.00** |
| | | |
| **Total Controllable Expenses** | **19.03** | **$165,300.00** |

| Operating Income | | $323,345 |
|---|---|---|

| General and Admin. Expenses | % of sales | S |
|---|---|---|
| Credit Card Fee | 2.5 | $21,716.49 |
| Insurance | | $8,686.60 |
| Rent | | $153,600.00 |
| Liquor Tax | 6 | $12,847.05 |
| Exterminators | | $800.00 |
| Cable & Internet | | $3,500.00 |
| Security | | $1,500.00 |
| Printing | | $1,800.00 |
| **Total General & Admin Expenses** | **20.04** | **$174,047.05** |

Page 8

Annual Detail

| Corporate Expenses | % of sales | S |
|---|---|---|
| Management Fees | 0 | $0.00 |
| Accounting & bookkeeping | | $3,500.00 |
| Marketing | | $2,000.00 |
| Legal | | $3,000.00 |
| Brand License (BowlBrands) | 1 | $8,686.60 |
| **Total Corporate Expense** | **1.98** | **$17,186.60** |

| Secured Ceditor Payments | |
|---|---|
| **Colorad Dept. Revenue** | $5,100.00 |
| **Veritex** | $45,000.00 |
| **TOTAL** | **$50,100.00** |

$786,648.63

| Net Operating Income | 9.44 | $82,011.11 |
|---|---|---|